Robert E. Lovejoy
vs.
Duncan B. Mackinnon et al.
} Eq. No. 10548.

May 27, 1931.

BLODGETT, P. J. Heard upon bill, answer and proof.

Bill in equity for specific performance of agreement to purchase real estate in North Attleboro, Mass.

The agreement in question was executed July 24, 1930, by Robert E. Lovejoy, complainant, and Duncan Mackinnon and Harriet D., his wife, respondents. The agreement is in substance as follows:

Lovejoy agreed to deed to respondents real estate located in North Attleboro, consisting of three lots of land and buildings on same for $15,000.00. Respondents agreed to deed complainant real estate in Pawtucket for $9,000.00. Respondents agreed to pay $3,500.00 in cash upon consummation of sale, and the balance found due complainant, after transfer and cash payment, complainant was to take a first mortgage for. Said properties were to be conveyed on or before September 1, 1930. After the signature appears the following postscript:

"P. S. The complete stock and fixtures together with the good will of the business also a cow now on the above premises is included in the sale price of the above mentioned property located at 342 Washington St., No. Attleboro, Mass. Added after the signature of H. E. Lovejoy with his consent.

(Signed) H. E. Lovejoy."

The agreement was drawn up by W. F. King, a real estate agent in Pawtucket, and it is admitted by complainant that King was his agent in the transaction.

Although no consideration is named in the agreement, a receipt from King to Duncan Mackinnon was introduced showing a payment of $200 "deposit on exchange for Lovejoy," dated July 24, 1930. Some time before July 24, 1930, King had this property for sale by consent of Lovejoy and inserted in the Pawtucket Evening Times an advertisement as follows:

"Gas Station. Store and home on Main road; old established stand selling 75,000 to 100,000 gallons yearly. Death causes sale. Might take income property in exchange. King, 93 Broad St., phone 6931."

In answer to this advertisement Harriet D. Mackinnon, one of the respondents, called at King's office and inquired about the property. There is some dispute as to whether she inspected the property with King or afterwards with her husband which is immaterial as both made an inspection before the agreement was executed.

Respdts' Ex. D. is a photograph of the premises showing the house and the gasoline station with six pumps in front. The property lies on the east side of the state road from Pawtucket to North Attleboro. A new road was built by the State of Massachusetts. Respdts' Ex. E. is a photograph of the intersection of this new road with the old road (Washington St.). The new road is a four lane highway which affords a way for through traffic north to avoid going through the business section of North Attleboro and since

its opening has been much used by through traffic. This road was laid out in 1930 and the engineering work on same done in January, 1930, and the stakes defining same set previous to the execution of this agreement.

The testimony shows that during the interviews between the parties to this agreement neither the complainant nor King, his agent, previous to the execution of same, informed the respondents that this road was to be constructed, and respondents say they knew nothing about the proposed new road.

It is inconceivable that complainant, who had been operating a gasoline station on old Washington street, about a quarter of a mile north of this intersection, for several years, could be in ignorance of the proposed new road.

The main dispute between the parties is as to what representations were made before the execution of the agreement by complainant or King, his agent.

The respondents claim that King said that the sales of gasoline amounted to 100,000 gallons a year, that complainant bought oil in car load lots and sold oil enough every year to net a profit of $1500 and that the sale of accessories in the store connected with the station was profitable.

Complainant testified his profit on gasoline was four cents a gallon and on oil forty cents a gallon.

Respondents claim that the only reason they agreed to purchase the property was the amount of business that the stand had done in the past and could possibly do in the future, and that they relied upon the representations made when they executed the agreement.

Duncan Mackinnon was a worker in a textile mill and received about $40 a week. He was looking for an opportunity, according to his testimony, to find a profitable business in which he, his wife and son could engage and that the representations as to the past and probable profits of this business appealed to him and to his wife. Respondents also testify that they were given time to check up on the receipts of the station before the deal should be finally consummated, although this does not appear in the agreement itself, nor does it appear that there was any binder named or acknowledged in the agreement. In fact, this $200 paid by the Mackinnons is claimed by King as part of his commission for the sale of the Mackinnon property in Pawtucket (see Respdts' Ex. K).

Respondents claim, and so testify, that at the time the agreement was entered into a certain time was given them to check up on the receipts of the station and store to determine the earning capacity of the same before the final deeds were passed and the amount of cash paid. The complainant kept no books which would show receipts and expenditures. The accounts were apparently determined by a cash register upon the slips registered therein.

The original agreement in writing contains no such conditional agreement, and the admittance of such collateral agreement by oral testimony was objected to by complainant on the ground that oral testimony could not be admitted to vary the terms of a written instrument, which is, of course, the general rule.

"The general rule under discussion is not violated by allowing parol evidence to be given of the contents of a distinct, valid, contemporaneous agreement between the parties which was not reduced to writing, when the same is not in conflict with the provisions of the written agreement. The exception is thus stated somewhat more guardedly by Mr. Stephen: The parties may prove 'the existence of any separate oral agreement as to any matter on which a document is silent, and which is not inconsistent with its terms, if, from the cir-

cumstances of the case, the Court infers that the parties did not intend the document to be a complete and final statement of the whole of the transaction between them.' "

Jones on Evidence, p. 552, par. 439 (444).

It would seem there must have been some discussion between the parties as to the amount of business since, although the original agreement is signed above the postscript, it contains no such agreement, yet the postscript itself was added and signed by complainant alone. Complainant says the postscript was signed by him after the other signatures had been attached.

Shortly after July 24, 1930, a son of respondents entered the premises and took charge by consent of complainant of the sale of gasoline from the pumps, and accessories from the store, and the sale of oil, and recorded such sales on the cash register. There was also delivered to this young man a large number of registered slips which showed the sales of gasoline, oil and accessories previous to the execution of the agreement. These slips evidenced the sale of very much less gasoline and oil than respondents claim both King and complainant represented had been sold. This young man was present four full days from morning until evening.

In consequence of this checking up and the results thereof showing such a discrepancy between the alleged representations and the actual sales, the respondents immediately notified complainant that they would not carry out the agreement.

The evidence seems to show that the sale of the business and the good will thereof was an important part of the whole transaction, and that the permission given respondents to take charge of the station and to check up on present and past receipts is evidence of a distinct, valid and contemporaneous agreement as to the written agreement, not in conflict with the original agreement.

The evidence of the advertisement shows that King, the agent of complainant, placed the sales of gasoline as from 75,000 to 100,000 gallons a year. This was inserted before the execution of the agreement in July, 1930. The record of registered slips shows sales of no such volume in the preceding year. Complainant testified to a four cent profit on a gallon. At 75,000 gallons a year this would represent a net profit of $3000 a year on gasoline alone. Complainant produces no books of account to show any sales or profits, and no bills or accounts showing the purchase of any such amount of gasoline. The cash slips from the cash register fall far below any such receipts for sales and such slips supposedly show sales not only of gasoline, but of oil and accessories as well.

The Court is of the opinion that the respondents desired to use the property as a business proposition and that the agent of complainant in bringing about the agreement did make certain representations in regard to the amount of business that the station had in the past that were not in accord with the facts as shown by the records produced, and that respondents were misled thereby and signed the agreement by reason of such misrepresentations.

The respondents did make an examination of the property as to its physical aspects before executing the agreement and were apparently satisfied in this respect. No question was raised by them as to the amount to be paid and there was no bargaining of any nature as to the price. This leads the Court to the belief that some negotiations were entered into between the parties as to the amount of business done contemporaneous with the execution, and that such negotiations were a vital part of the contract, and that complainant by his action in per-

mitting respondents to take charge of the station and check up the business done, and also by turning over slips from the cash register to respondents for examination of past receipts, and by adding the postscript to the original agreement, ratified the collateral contract and made it a part of the original as explaining such postscript.

There is also a question as to a possible duty on the part of complainant or his agent to have acquainted the respondents with the fact that a new layout of the state road had been begun as such layout might seriously affect the business of this station. The respondents were residents of Pawtucket. Duncan Mackinnon was not and never had been in the automobile business. Lovejoy must have known of the contemplated change in the layout of the new road as he had carried on business in this location for a long period. The conclusion of the Court as to this question is that knowledge on the part of complainant that this change was under way was a leading inducement to complainant to sell the business and was an important feature of the same. A careful investigation by respondents would have given them the same knowledge. It was not a fact within the knowledge of complainant alone and which could not have been known to respondents save from complainant or his agent. It could hardly be called a suppression of the truth by the complainant.

The agreement is somewhat vague as to the exact premises to be conveyed since complainant held the title to four contiguous lots as appears by a plat on the record. The agreement might easily have specified the exact lots covered by same. Complainant testified that he pointed out to respondents, when they were on the land, the land conveyed by the agreement. This is denied by respondents, but as the three lots named in the agreement are stated as having buildings on the same and

are divided into three separate lots on plat of the assessors of North Attleboro, the Court feels the description is reasonably accurate.

"The remedy of specific performance is not a right of complainant but rests in the sound discretion of the court guided by the principles of equity."

*Stuart* vs. *Boston Wire Stitcher Co.*, 50 R. I. 409.

The Court is of the opinion that the respondents were not fairly used in the matters leading up to the execution of the agreement, that vital matters of fact relative to the business of the station were misrepresented to them by reason of which they were induced to execute the agreement, and that, therefore, the bill should be dismissed.

Decree may be entered accordingly.

For complainants: Thomas P. Corcoran, C. S. Mangan.

For respondents: T. J. McParlin, Joseph T. Witherow.